IRA P. ROTHKEN (CA SBN 160029)
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 924-4250
Facsimile: (415) 924-2905
Email: ira@techfirm.com
Co-Lead Counsel for Plaintiffs and the Proposed Class
(Additional Co-Lead Counsel appear on signature page)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re T-Mobile Sidekick Litigation | Civ. Action No. C 09-04854 JW<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Eli Mapstead, Lisa and Nicole Marinaro, Lucinda Miller, Mary Pietler, and Maureen Thompson (collectively "Plaintiffs") bring this class action suit against T-Mobile USA, Inc. ("T-Mobile"), Danger, Inc. ("Danger") and Microsoft Corporation ("Microsoft") (collectively "Defendants"). Plaintiffs make the following allegations based upon their own knowledge, as well as an investigation undertaken by Plaintiffs' counsel, which included, *inter alia*, review and analysis of Defendants' press releases, Defendants' websites, web forums, and various news articles.

### NATURE OF THE ACTION

1.      The Sidekick is a handheld cellular device, which is exclusively provided by T-Mobile, with software developed and provided by Danger, a subsidiary of Microsoft. The

In re T-Mobile Sidekick Litigation

Sidekick's features allow users to, among other things, send and receive email, store contact information in address books, utilize a calendar feature, write to-do lists and notes, and take and store photographs. On or around October 2, 2009, all Sidekick users began experiencing an inability to access the stored data (as well as applications, such as wallpapers, games and ringtones) or utilize the Sidekick's data services, due to Defendants' failures to adequately backup and maintain such data.

2. Plaintiffs bring this class action suit on their own behalf and on behalf of all other users of T-Mobile's Sidekick device nationwide, who were damaged as a result of the disruption of service and/or loss of personal data. This suit seeks to redress Defendants' failure to adequately provide service and/or maintain the personal data of Sidekick users. Specifically, this action arises from Defendants' failure to maintain or adequately back up users': (i) contacts in their address books; (ii) calendars; (iii) to-do-lists; (iv) notes; (v) photos; and (vi) downloaded catalog items, such as certain applications including wallpapers, games, and ringtones.

3. As reported in numerous published sources, Defendants either failed to employ any backup at all for users' data or failed in the design of the backup system. As a result, personal data belonging to Plaintiffs and Class members was lost or destroyed on or around October 2, 2009. Around that time, Sidekick users also began experiencing an inability to access data and content on their devices, including, but not limited to, contacts, calendars, to-do lists, notes, photos, e-mails, and even the complete loss of device functionality (*i.e.*, the phone, internet, and text messaging services were not operable). Users also began experiencing an inability to access all data services, including email service, instant message service, social-networking service, photo service and other applications.

4. Defendants began restoring access to contacts on October 19, 2009, more than two weeks after the outage began. Defendants began restoring access to other important data, such as

calendars, to-do-lists, notes, and items in the download catalog, in the beginning of November, one month after the outage began. However, to this date, nearly four months after the outage began, many users have still been unable to retrieve their data.

5.     Plaintiffs seek damages to compensate themselves and the Class for their loss (both temporary and permanent) of data, as well as service interruptions, and their time and effort spent attempting to restore their data.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from at least one Defendant; there are more than 100 Class members nationwide; and the aggregate amount in controversy exceeds $5 million.

7.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because Defendant Danger, Inc. is headquartered in this District and/or because the improper conduct alleged in this Complaint occurred primarily in, and was directed from, this District.

## PARTIES

8.     Plaintiff Eli Mapstead resides in Bakersfield, California.

9.     Plaintiffs Lisa and Nicole Marinaro, who are sisters, reside in Pennsylvania.

10.    Plaintiff Lucinda Miller resides in Arizona.

11.    Plaintiff Mary Pietler resides in New York.

12.    Plaintiff Maureen Thompson resides in Georgia.

13.    Defendant T-Mobile USA, Inc., ("T-Mobile") is a leading provider of cellular phone and data service in the United States. It is a Delaware corporation headquartered in the State of Washington. T-Mobile conducts business throughout the State of California and the nation.

14.     Defendant Danger, Inc. ("Danger") provides end-to-end mobile data and internet services to wireless providers, such as T-Mobile.  Danger is a subsidiary of Microsoft Corp.  It is a Delaware corporation headquartered in Santa Clara County, California.  Danger conducts business throughout the State of California and the nation.

15.     Defendant Microsoft Corporation ("Microsoft") is a computer technology company that designs, develops, manufactures, markets, and sells a broad range of technology products, including both software and hardware.  Microsoft completed its acquisition of Danger, Inc. on April 15, 2008.  Microsoft is based in Redmond, Washington.  Microsoft conducts business throughout the State of California and the nation.

**FACTUAL BACKGROUND**

**I.     Defendants' False Assurances Regarding Data Protection.**

16.     T-Mobile sells the "T-Mobile Sidekick" and has since 2002.  The Sidekick line of devices ("Sidekicks") includes the T-Mobile Sidekick, T-Mobile Sidekick 2, T-Mobile Sidekick 3, T-Mobile Sidekick iD, T-Mobile Sidekick LX, T-Mobile Sidekick Slide, T-Mobile Sidekick 2008, and T-Mobile Sidekick LX 2009.

17.     T-Mobile is currently the exclusive provider of Sidekicks in the United States.

18.     Danger develops and provides the Sidekick software, including its operating system, and back-end technology services associated with Sidekicks.

19.     Sidekicks are unique among mobile phones in that they rely almost exclusively on Microsoft/Danger's servers to store and process most functions and data.  This means that Microsoft/Danger stores Sidekick users' data, including address book contacts, calendar entries, to-do lists, notes, photos, text messages, and other applications, on Microsoft/Danger servers, not on the Sidekicks themselves.

20.     This is an example of so-called "cloud computing" whereby users store

**CONSOLIDATED CLASS ACTION
COMPLAINT**

1    information via the Internet on technology providers' servers, but not on their own devices.  Other

2    examples of cloud computing include Facebook and Google's Gmail email service.

3           21.    The Sidekick system is an example of a "cloud client."  This means Sidekick users

4    rely on Microsoft/Danger to provide Sidekick services via the cloud (Internet) and that Sidekicks

5    are essentially useless should Microsoft/Danger neglect or fail to provide these services.

6           22.    The storing of user information on Microsoft/Danger servers rather than the

7    Sidekick itself was highlighted as an advantage or benefit to Sidekick users because, among other

8    things, it meant that user data could simply be sent by Microsoft/Danger servers to a new

9    Sidekick should an existing Sidekick become lost or destroyed.  The Microsoft/Danger cloud

10   model was marketed and sold to Sidekick users as a way for those users to have constant access

11   to all of their data and information.

12          23.    For example, in an October 24, 2007 press release, Danger stated:

13          Powered by Danger's software and services, the Sidekick LX offers an integrated
            and simple-to-use suite of applications including push e-mail, Web browsing,
14          instant messaging, a full featured mobile phone, calendar, address book and media
            player as well as a constantly updated content catalog.  With the powerful service
15          that supports each device, users are provided with additional benefits, such as an
            always-on internet connection, free ***automatic data back-up***, and ongoing feature
16          and user-experience improvements.  Users also have the option to access all of
            their data (photos, address book entries, etc.) and applications from any Web-
17          enabled computer.  (Emphasis added.)

18          24.    In a November 15, 2007 T-Mobile press release, T-Mobile stated:  "[a]dditional

19   benefits of Danger's service include always-on internet connection, ***automatic data back-up*** and

20   ongoing feature and user-experience improvements." (Emphasis added.)

21          25.    Moreover, on its website, Danger describes its client/server model as follows:

22   "[o]ur architecture shifts heavy processing tasks to our server instead of client devices, creating

23   the power and economic advantage of the Danger solution.  The system components work

24   together to provision and manage all user services and user data, and allows our developer

**CONSOLIDATED CLASS ACTION
                                                          COMPLAINT**

community to create premier mobile content."

26. While T-Mobile is the exclusive carrier for Sidekicks and provides the wireless internet connection necessary for Sidekicks to function with Microsoft/Danger's server, it is Microsoft/Danger that actually stores the Sidekick user information and is primarily responsible for the safekeeping of that data.

27. Moreover, in Sidekick User Manuals, Defendants touted the fact that data is stored on a server and protected: "The data you store in your device's Email, To Do, Calendar, Address Book, Notes, and Camera applications . . . is **stored on servers in a data center** with enhanced security and firewall features." (Emphasis added.)

28. Similarly, a December 11, 2007 press release by T-Mobile stated: "At the heart of the Sidekick Slide is the service offered by Danger, Inc., featuring various add-ons such as secure permanent connections to the Internet and free-of-charge **automated data backups**." (Emphasis added.)

29. Defendants' product manual also touted the fact that data is regularly backed up, in the following Q&A:

> **I need to remove my battery, so I did. After I put the battery back in my device, it is powered up, but all my messages and other data were gone. Is it all gone for good?**
>
> No, **all your data is regularly saved to the Danger service so it is safe**. If you wait a few minutes, all your data will be restored to your device. (Note, however, that any data you entered or modified between the last save to the Danger service and when you removed the battery will be lost.)
>
> Chances are you removed the battery before powering off your device. Every time you power off your device, your data is saved to the device's internal flash memory. However, if you remove your battery before shutting down, your data will not be saved to flash. **It is however, saved on an ongoing basis to the service, which means your data is always backed up**. However, for your convenience, always power off your device before removing the battery. (Emphasis added.)

30. Additionally, T-Mobile's published Privacy Policy specifically states that the

Company would treat user information maintained on the Danger server with the same high level of protection afforded other propriety or confidential information under its terms:

> Services and functionality offered through certain devices are provided in conjunction with other entities. As a result, personal information from your devices may be uploaded and stored on their servers. For instance, T-Mobile Sidekick® services are provided in conjunction with Danger, Inc., and ***personal information from your device is stored on the Danger® servers***. . . . Their specific terms and conditions, terms of use, and privacy policies apply to those services. (Emphasis added).

31. Notwithstanding these representations regarding backup and data storage procedures, Defendants lacked the necessary protections to safeguard against the loss of users' data.

## II. Sidekick's Data Outage.

32. On or around October 2, 2009, despite assurances regarding the benefits of the Sidekick backup and data storage procedures, Sidekick users experienced a major outage. Users were unable to access data on their devices, including but not limited to contacts, calendar entries, to-do lists, notes, applications previously paid for and downloaded, instant messages, emails, and even a complete loss of device functionality such as phone, internet, and text messaging services.

33. Over the course of the next week, users who visited the T-Mobile website "forum" (a difficult to locate web page maintained by T-Mobile) or followed T-Mobile twitter announcements were informed of the outages and updates regarding possible service restoration. On October 3, 2009, a message appeared on the T-Mobile forum stating:

> Dear valued T-Mobile Sidekick customers: I realize that for many of you, your T-Mobile Sidekick is how you stay in touch with your friends, family and others. I sincerely apologize for the impact the current disruption of data services may be having on you. I assure you that T-Mobile is working very closely with Danger/Microsoft to resolve the issue as quickly as possible. T-Mobile-supported services, such as voice calls and SMS/MMS, have not been affected and continue to be operational. Danger/Microsoft has been working, and will continue working through the week, to restore data functionality and other features.

34. During this time, Defendants failed to properly advise users that they should not

remove their batteries and/or should not let the battery drain completely.

35.    It was not until October 6, 2009, four days after the outage began, that Defendants finally advised users not to reset the device by removing the battery.  However, Defendants apparently forgot to advise customer service of these facts, as many users were advised by T-Mobile, even after this announcement, to reset their phone.[1]

36.    As a result of Defendants' delay in notifying users of the proper outage procedures, many users removed their batteries in the expectation that the data would be restored. On October 12, 2009, one user wrote:

> When [the data outage] first happened I had no internet, obviously.  That lasted for about . . . 5 days.  That whole time every time I got a text message or picture message it wouldn't alert me that I had one.  About a day after I got my internet back my phone randomly shuts off by itself, and it was fully charged.  I couldn't get it to turn back on so I did what customer service usually tells you to do and I took the battery and the card out, waited about three minutes and put it back in. . . . About 3 or 4 minutes later it turned back on and it was fully charged, so it wasn't dying and my battery was fine.  I went to text my boyfriend to let him know my phone was back on and all of my contacts were gone.  Later that night I get a neat text message from tmobile about important information on tmobile.com regarding sidekicks so I go there and it tells me that if you allow your phone to power down or you remove your battery during this time when all of these problems are happening that they CANNOT and WILL NOT be able to restore your contacts. UMMMM you think that information might of been helpful earlier?[2]

37.    On October 10, 2009 T-Mobile issued a press release informing their users, in part, as follows:

> T-Mobile and the Sidekick data services provider, Danger, a subsidiary of Microsoft, are reaching out to express our apologies regarding the recent Sidekick data service disruption.  We appreciate your patience as Microsoft/Danger continues to work on maintaining platform stability, and restoring all services for our Sidekick customers.
>
> Regrettably, based on Microsoft/Danger's latest recovery assessment of their systems, we must now inform you that personal information stored on your device

---

[1]    http://www.phonenews.com/nationwide-t-mobile-sidekick-data-outage-9160/.

[2]    http://www.tmonews.com/2009/10/sidekick-data-outage/.

**CONSOLIDATED CLASS ACTION COMPLAINT**

1
2
3

– such as contacts, calendar entries, to-do lists or photos – that is no longer on your Sidekick almost certainly has been lost as a result of a server failure at Microsoft/Danger.  That said, our teams continue to work around-the-clock in hopes of discovering some way to recover this information.  However, the likelihood of a successful outcome is extremely low.

4
5
6

We continue to advice customers to NOT reset their device by removing the battery or letting their battery drain completely as any personal content that currently resides on your device will be lost.[3]

7

38.    Further complicating the data loss was the fact that Sidekicks, unlike other

8

smartphones,[4] are not designed to synchronize locally with a user's personal computer without

9

additional software and hardware.  This means most users were not able to backup their data

10

locally on their computers, and instead were encouraged and required to rely on

11

Microsoft/Danger.

12

13

39.    On October 11, 2009, <u>The Wall Street Journal</u> reported the following:

14
15
16

For more than a week, users of the Sidekick - a device that can send email and surf the Web - have had problems with the phone's online capabilities, preventing access to contacts, calendar appointments and other personal data that are stored on server-computers operated by Microsoft.

17
18
19
20

But while Microsoft and T-Mobile USA, the wireless carrier owned by Deutsche Telekom AG that sells the Sidekick, say they have restored online access to the device, many Sidekick subscribers may not be able to recover their personal data. On a message posted on T-Mobile's Web site on Saturday, the carrier warned that any personal data that isn't stored locally on a Sidekick customer's device - including contacts, calendar entries, to-do lists and photos - has "almost certainly" been lost due to a failure with Microsoft's servers.

21

.  .  .  .

22
23
24
25

The loss of personal data is especially awkward for Microsoft since Sidekick's online service is designed, in part, to ensure personal information can be easily recovered if a device is lost or destroyed.  The safety of data is a big part of the appeal of "cloud services," a broad trend in which local computing functions and data move into computers in data centers.

26

[3]      http://www.techcrunch.com/2009/10/10/t-mobile-sidekick-disaster-microsofts-servers-crashed-and-they-dont-have-a-backup/.

27
28

[4]      A smartphone is a mobile phone offering advanced capabilities, such as PC-like functionality, including, for example, iPhones or Blackberrys.

40.     In a follow-up article dated October 12, 2009, <u>The Wall Street Journal</u> reported that T-Mobile has "deflected most of the blame to Microsoft and its Danger unit, which was responsible for handling the personal data and contacts stored on the Web."

41.     On October 12, 2009, T-Mobile updated its users with the following statement on its website:

> Regarding those of you who have lost personal content, T-Mobile and Microsoft/Danger continue to do all we can to recover and return any lost information.  Recent efforts indicate the prospects of recovering some lost content may now be possible.  We will continue to keep you updated on this front; we know how important this is to you.

> In the event customers have experienced a significant and permanent loss of personal content, T-Mobile will be sending those customers a $100 customer appreciation card.  This will be in addition to the free month of data service that already went to Sidekick data customers.  This card can be used towards T-Mobile products and services, or a customer's T-Mobile bill.  For those who fall into this category, details will be sent out in the next 14 days – there is no action needed on the part of these customers.

42.     Notably, T-Mobile did not, and has not, indicated how it defined "significant and permanent loss of personal content."  It also has not addressed whether content that users purchased in the download catalog will be restored free of charge.  Also, on information and belief, most Sidekick users have not qualified for or received the customer appreciation card, and many who do are receiving less than $100.

43.     On October 13, 2009, eWeek.com reported that the breach "wiped out personal data for roughly 800,000 users."

44.     On October 15, 2009, T-Mobile issued the following announcement on its website:

> We are pleased to report that we have recovered most, if not all, customer data for those Sidekick customers whose data was affected by the recent outage.  We plan to begin restoring users' personal data as soon as possible, starting with personal contacts, after we have validated the data and our restoration plan.  We will then continue to work around the clock to restore data to all affected users, including calendar, notes, tasks, photographs and high scores, as quickly as possible.

We now believe that data loss affected a minority of Sidekick users.  If your Sidekick account was among those affected, please continue to log into these forums for the latest updates about when data restoration will begin, and any steps you may need to take.  We will work with T-Mobile to post the next update on data restoration timing no later than Saturday.

We have determined that the outage was caused by a system failure that created data loss in the core database and the back-up.  We rebuilt the system component by component, recovering data along the way.  This careful process has taken a significant amount of time, but was necessary to preserve the integrity of the data.

We . . . are taking immediate steps to help ensure this does not happen again.  Specifically, we have made changes to improve the overall stability of the Sidekick Service and initiated a more resilient backup process to ensure that the integrity of our database backups is maintained.

45.     Notwithstanding T-Mobile's statement that data would be restored, Plaintiffs and numerous Class members still have not recovered all of their data, nearly four months after the outage began.

46.     While Microsoft attempted to lay the blame on a server failure, industry experts in numerous published sources stated that the loss was the result of Defendants' failure to employ either an adequate backup or any backup at all.  An article on techcrunch.com dated October 10, 2009 stated:

The fact that T-Mobile and/or Microsoft Danger don't have a redundant backup is simply inexcusable, especially given the fact that the Sidekick is totally reliant on the cloud because it doesn't store its data locally. . . .  There is some speculation that this was not actually caused by a server meltdown, but by Danger's failure to make a backup before a Storage Area Network upgrade that was botched.[5]

47.     An article on AppleInsider.com dated October 21, 2009 provided additional details as follows:

"It will take several days to actually get the database back up," [a] source noted, echoing earlier reports that indicated that it took 6 days just to create a normal full backup of the data.  The time and storage resources involved in backing up the tremendous amount of data were cited as the reason why Microsoft's Roz Ho reportedly instructed Danger employees to proceed with work without the full

---

[5]     http://www.techcrunch.com/2009/10/10/t-mobile-sidekick-disaster-microsofts-servers-crashed-and-they-dont-have-a-backup/.

1    backup in place over their objections . . . .

2         48.    In short, Defendants failed to implement the necessary safeguards to secure

3    Sidekick users' data.  Defendants' wrongful conduct led to the loss of significant amounts of data,

4    in some cases permanently.

5

6  **III.    The Loss of Several Categories of Data.**

7         49.    Defendants' conduct resulted in the loss of several categories of data.  The loss of

8    each category, as detailed below, resulted in damage to the Class.

9         50.    Many Sidekick users, to this day, do not have their data restored even after

10   spending hours communicating with T-Mobile representatives.  For example, as recently as

11   January 24, 2010, a Sidekick user posted the following on the T-Mobile forum:

12

13        [T]he service is terrible, my sidekick hasnt worked 4 2 **bleep**ing months, they
          lied about compensation in regards 2 it not working and now they cant even help
14        me fix my phone, t mobile as soon as this contract is over im GONE and im tellin
          EVERYONE i no not 2 buy ur piece of  phones for those who have a bought a
15        sidekicks in the past, like me, get out as soon as u can for those who haven't, im
          beggin u, DO NOT BUY A T MOBILE SIDEKICK IT IS SOOOOOO FAR
16        FROM WORTH IT!!!![6]

17     **A.  Loss of Contacts.**

18        51.    From the beginning of the data loss on October 2, 2009, Class members were

19   unable to access any of their contact information, including business contacts.

20        52.    Without the ability to access contacts, Class members were inconvenienced in

21   several ways.  Among other things, they missed the opportunity to contact other people, and they

22   were forced to spend time rebuilding their contact information.  Users rely on their contact

23   information for a multitude of important tasks.

24        53.    One Sidekick user stated: "I lost everything.  Business contacts, personal contacts,

25

26

27   _____
     [6]      http://forums.t-mobile.com/t5/Sidekick-Lounge/Complaints-about-the-Sidekick-outage/td-
28   p/259078;jsessionid=0FF00A503B53BFC22DB2063B63E0390A.

In re T-Mobile Sidekick Litigation              12                    **CONSOLIDATED CLASS ACTION
                                                                       COMPLAINT**

international contacts, I understand things happen but Sidekick should have thought of a backup plan before this happened.  Losing business contact could not have happened at a (worse) time . . . No sales means no money, no numbers mean no contact."[7]

54.    Indeed, Plaintiff Lucinda Miller lost access to multiple contacts.

55.    Business contacts are an essential part of Sidekick users' work.  This is especially true in the digital age where users increasingly store contact information on their phones in lieu of other mediums.

56.    On October 19, 2009, T-Mobile posted instructions on its web forum regarding how to restore contacts.  The process was complicated, and users had to follow a number of complex steps.  First, they were required to log onto the TMobile.com website from a computer, or call T-Mobile customer service.  Upon doing so, they were required to export the contacts to a computer, then import the contacts to their Sidekick.  This was a time consuming and confusing process.

57.    Many Sidekick users who followed the instructions found that they were still missing many contacts and/or portions of contacts.  According to an October 20, 2009 eweek.com article:

> Messages left by Sidekick users on the T-Mobile forums throughout the morning . . . suggest that the contact restoration has not been an entirely smooth process.  "I just restored my contacts and I only have 64 contacts out of the 300 that I had before," wrote one T-Mobile Sidekick user, "and some of the names are blank without numbers." . . . "I noticed that I have a few names but no numbers," wrote another user.  "I got 34 of 62 contacts back, including some that are name only," commented a third.  "I'm adding them one by one to my SIM card because I don't trust that they are going to stay on my phone."[8]

58.    Negative messages from as early as the beginning of October regarding contacts

---

[7]    http://www.hostedsolutions.com/press/blog-detail/What-s-your-plan-to-prevent-a-Sidekick-data-disaster-for-your-business-5.

[8]    http://www.eweek.com/c/a/Mobile-and-Wireless/Microsoft-Posts-Sidekick-Restore-Link-On-TMobile-Web-Site-514820/,

1   and other lost data were deleted by T-Mobile from their forum.  According to a blog dated

2   October 12, 2009:

3
4
5       T-Mobile Banned me from their forums because I was voicing my opinion about
        their outage and suggesting customers contact the Washington State Attorney
        General's office.  I am disgusted, not only by the sidekick outage at TMobile, but
        because T-Mobile strung us along for 7 days of reassuring us that our information
6       will come back before they told us that they pretty much lied.  They were not
        updating us on a regular basis about anything at all.  They lost our information.
7       Everything. 300+ contacts - numbers, addresses, email addresses, 30+ important
        notes, 20+ tasks -- calendar with important dates, birthdays, anniversaries, etc.  At
8       this time, they have offered one free month of data service. This outage has cost
        me a lot of money as I use my sidekick for business.[9]

9
10      59.     This same user reported that an entire thread with "3700 message of frustrated

11  Sidekick subscribers of 10+ days have been deleted from T-Mobile's threads," and noted that T-

12  Mobile moderators were editing and selectively deleting messages and banning people.

13      60.     The T-Mobile forum is still receiving complaints from users who have not been

14  able to restore their contacts or whose contacts were lost a second time.  A post dated January 27,

15  2010 stated:

16
17      Every time I try to restore my contacts it keeps saying 'Sorry-we're not able to
        retrieve your information at this time.  Please continue to check www.t-
        mobile.com/sidekick for the latest updates on our recovery efforts.'  That's been
18      happening to me for the past 3 months now.  What should I do?  Should I call
        Customer Care?[10]

19
20      61.     A post dated December 18, 2009 stated: "Are You Kidding Me! ! ! Contacts Gone

21  Again! - This is driving me freaking nuts!  I have been more than patient.  I was not one of the

22  ones who complained the first time.  But enough is enough!  My contact, emails, text all gone

23  again!  This is too much!"[11]

24

25  _____

    [9]     http://sidekickout2009.blogspot.com/2009/10/t-mobile-outage-outrage.html.

26  [10]    http://forums.t-mobile.com/t5/Previous-Sidekick-Models/I-have-a-problem-on-restoring-
27  my-contacts/m-p/304253;jsessionid=319FA93F0920B909AF91743695B3339D.

28  [11]    http://forums.t-mobile.com/t5/Sidekick-Lounge/Are-You-Kidding-Me-Contacts-Gone-

62.     Presently, more than four months after the initial data loss, numerous persons including, for example, Plaintiff Marinaro have not had their contacts and other data restored. Additionally, Plaintiff Thompson has recovered only two-thirds of her contacts. Plaintiff Miller appears to have permanent data loss.

### B.     Loss of Calendars, To Do Lists, and Notes.

63.     From the beginning of the data loss, Sidekick users were unable to access their calendars, to-do lists, and notes.  The calendar function enabled users to input and receive updates of upcoming events, such as personal events, appointments, and business meetings.  The to-do list function enabled users to input important activities that needed to be completed.  The notes function could be used to write down any information - some users used the notes field to record passwords.

64.     Some users who were unable to access their calendar, to-do list, or notes missed meetings and appointments, resulting in a financial loss.  For example, one user stated: "because of the loss of the calendar & the notepad, I owe $90 for 2 missed appts. & my son lost ALL of his lyrics to his music!"[12]

65.     Another user stated: "I'm a manager for a major hardware store and had customer notes, passwords, et etc, and I am lost."

66.     Yet another user stated: "I have all of my password in my notes and I can [not] access them, not even on the website."[13]

67.     T-Mobile did not post instructions on how to recover calendars, to-do-lists and

---

Again/m-p/276633.

[12]     http://www.hiptop3.com/archives/get-a-credit-for-the-sidekick-data-outage.

[13]     http://www.boygeniusreport.com/2009/10/04/t-mobile-sidekick-users-left-in-the-dark-as-data-outage-continues/comment-page-4.

**CONSOLIDATED CLASS ACTION COMPLAINT**

notes until November 4, 2009, one month after the data outage began.  Yet, even with the delayed posting, the instructions were not a guarantee of data restoration.

68.     To date, Plaintiff  Mapstead's notes have not been restored.  Other Class members have experienced the same lack of data restoration.

**C.      Loss of Data from Download Catalogs Including Applications Such as Ringtones, Wallpapers and Games.**

69.     From the beginning of the outage, Plaintiffs and Class members were unable to access various items they previously purchased and downloaded from T-Mobile's Download Catalog, including applications.

70.     On November 2, 2009, one month after the data loss, T-Mobile posted an announcement in its web forum stating that it was sending an over-the-air ("OTA") update that would allow Sidekick users to recover data acquired from the catalog.

71.     However, many Class members were unable to restore their catalog items after following T-Mobile's instructions and/or calling T-Mobile.  A December 27, 2009 post on the T-Mobile forum stated: "I purchased several themes, games, and ringtones and they are gone since the restore. I did the only procedure and got everything back but those.  Anything that can be done?"[14]

72.     Also, Plaintiff Miller's downloaded catalog items have not been restored, and she was not issued a credit for the items she previously purchased.

**D.  Loss of Photos.**

73.     From the beginning of the data loss, Plaintiffs and Class members were unable to access their photos.

74.     T-Mobile first posted instructions regarding how to restore photos on November 9,

---

[14]      http://forums.t-mobile.com/t5/Download-Catalog/what-to-do-about-things-you-lost-but-paid-for/m-p/281021.

**CONSOLIDATED CLASS ACTION COMPLAINT**

2009, one month after the data loss began.

75.     However, the instructions were often ineffective.  Many Class members still have not had their photos restored.

76.     Moreover, upon restoration, many Class members received pictures that did not belong to them.  One Class member informed Plaintiff's Lead Counsel that photos from another user who she did not know were restored to her phone.  She contacted T-Mobile and was told that that the photo swap problem was a common occurrence.

77.     Plaintiff Miller also received photos from another user.  One such picture was of a semi-nude young girl.

78.     The photo swap issue constitutes an invasion of privacy for affected Class members.

**E.   Loss of Other Services.**

79.     Class members lost their ability to access email for an extended period of time. On October 12, 2009, one Sidekick user commented:

> I worked for danger/data card (strictly sidekick) and I didn't understand why people would complain when service would be out.  NOW I do.  I personally own a sk 2008 and I love my phone.  I started a business and used my tmomail or sidekick email for a contact point.  I haven't been able to receive any of my email regarding my business.  I probably lost out on $1000!!!  I hope you have an idea now as to why everyone is mad.  I can't have a data device and no service.  It just doesn't work!!!  Please be a little more sympathetic to the sidekick users and loyal tmobile customers that pay your bills.[15]

80.     On October 6, 2009, a Sidekick user posted the following:

> [W]hen data came back online for me last night, social networks were left wide open, every log in attempt to myspace or fb that i made took me into someone elses acct! a billion log in attempts only took me into a billion other ppls pages and them into mine appearantly, cause they changed everything in my acct, including my bday making me 16 again lol!! of course tmobile did nothing for me, and myspace didnt either… im beginning to wonder about the actual security on this

---

[15]     *Id.* at post #112.

In re T-Mobile Sidekick Litigation                    17                    **CONSOLIDATED CLASS ACTION COMPLAINT**

1  wonderful Danger Network.[16]

2  This data mix up constituted a breach of users' privacy.

3  **IV.    The Named Plaintiffs' Experiences.**

4      **A.    Eli Mapstead.**

5

6      81.    Plaintiff Eli Mapstead first purchased a Sidekick in or about 2003.  His current

7  model, the Sidekick LX 2008, is his fourth.  On or about October 3, 2009, Plaintiff Mapstead

8  noticed that he lost access to data service, losing e-mail functionality, personal data, and access to

9  data.

10      82.    Plaintiff Mapstead experienced several problems: his email settings disappeared

11  and his email was unavailable; his non-T-Mobile email accounts disappeared; the data portion of

12  his phone was unusable; his download catalog was unavailable; his contacts were unavailable; his

13  notes were unavailable; his instant messenger function was unavailable; his web browser was

14  unavailable; and access to the web was unavailable.

15

16      83.    The service was slowly restored over approximately the next ten days, but has not

17  been restored completely.

18      **B.  Lisa and Nicole Marinaro.**

19      84.    Plaintiffs Lisa and Nicole Marinaro are sisters.

20      85.    Plaintiff Nicole Marinaro has a contract with T-Mobile for cell phone service.  The

21  contract began on or around November 2007.

22      86.    Her sister, Plaintiff Lisa Marinaro, uses a line of service on Nicole's contract.  Lisa

23  owns and uses a T-Mobile Sidekick device on this line of service.

24      87.    Plaintiff Lisa Marinaro relies on her Sidekick for contact information, as well as

25  the calendar function.  She also has pictures and ringtones on her Sidekick.  She suffered a

26

27  _____

28  [16]    http://www.boygeniusreport.com/2009/10/04/t-mobile-sidekick-users-left-in-the-dark-as-data-outage-continues/comment-page-4/#comments, post #89.

complete and catastrophic loss of all data on her Sidekick.  She lost all of her contacts, calendars, photos, and ringtones in the data outage.  Additionally, her service was interrupted for three days.

88.    Plaintiff Lisa Marinaro is still missing all her contacts.  She followed T-Mobile's instructions regarding how to recover her contacts, first using her Sidekick and then a computer. However, she was unable to recover the contacts.  Many of her friends have also been unable to restore their contacts after following T-Mobile's instructions.

89.    Plaintiff Marinaro still has not recovered her photos, despite following T-Mobile's instructions.

90.    She has recovered her ringtones.

**C. Lucinda Miller.**

91.    Plaintiff Lucinda Miller suffered various problems on two different Sidekick plans.

92.    Her contacts were unavailable, but were eventually restored.

93.    Her applications, ringtones, and download catalog were lost and have not been restored.  She hasn't received a credit or other compensation for applications, music files, and ringtones that were previously purchased and have not been restored.

94.    Her pictures were lost, and the wrong pictures belonging to someone else were restored to her Sidekick.  One such picture was of a semi-nude young girl.  She could get no assistance in locating the correct pictures.

95.    Plaintiff Miller purchased a Sidekick plan for her son on September 12, 2009. Soon thereafter both her and her son's Sidekicks stopped receiving internet service, and their download catalogs stopped working.  Service on both phones worked intermittently and unreliably.

96.    She cancelled her services with T-Mobile on November 18, 2009 because, amongst other things, the services still had not been restored.

In re T-Mobile Sidekick Litigation               19               **CONSOLIDATED CLASS ACTION COMPLAINT**

**D. Mary Pietler.**

97.    In or around December 2007, Plaintiff Mary Pietler purchased a Sidekick and signed a two year service agreement with T-Mobile.  The Sidekick was purchased by Plaintiff for use by her grandson.

98.    On or around October 3, 2009, Plaintiff's grandson was no longer able to access his personal data from his Sidekick, including, for example, his personal contacts, calendar entries, saved emails and messages, and downloaded applications including ringtones, games, and wallpaper.

99.    On or around the same date, Plaintiff's grandson experienced a disruption in service, including data service and internet connectivity.  The disruption in service lasted for approximately one week, and the disruption of internet connectivity lasted longer.

**E. Maureen Thompson.**

100.    Plaintiff Maureen Thompson maintains an account with T-Mobile for wireless telephone service.  Her daughter uses a line of service on Plaintiff's account and owns and uses a T-Mobile Sidekick device on this line.

101.    On or about October 8-11, 2009, Plaintiff Thompson suffered a complete and catastrophic loss of all data on her daughter's Sidekick.  This includes but is not limited to loss of appointments and contacts.  Plaintiff's daughter also used her Sidekick to store, among other items, pictures, song lyrics, and business contacts.

102.    She attempted to recover her data pursuant to T-Mobile's directions.

103.    Plaintiff Thompson still does not have all of her contacts restored, nor does she have any pictures, notes, calendar entries, or any other data.

104.    In sum, as a result of Defendants' conduct, Plaintiffs and Class members suffered damages including, but not limited to, the following:

a.   Loss of use of Sidekick phones;

b.   Loss of access to data;

c.   Out-of-pocket costs for, among other things, catalog items that were previously purchased and not restored;

d.   Time and inconvenience in researching the data loss, communicating with Defendants, restoring or attempting to restore data, etc.; and

e.   Other economic and non-economic damages.

105.   Plaintiffs also seek injunctive relief including but not limited to: (i) restoration of currently unrestored data; and (ii) improvements in Defendants' Sidekick server to properly maintain, store, and/or backup users' electronic information.

## CLASS ACTION ALLEGATIONS

106.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and the following class:

> All persons or entities throughout the United States whose Sidekick phones experienced a temporary or permanent loss of data or interruption in service related to Defendants' October 2009 data loss and service disruption incident (the "Class").

107.   The Class does not include Defendants or their officers, directors, or any entity in which Defendants hold a controlling interest.

108.   **Numerosity**.  The Class consists of hundreds of thousands of persons or entities, making joinder impracticable.

109.   **Typicality**.  The claims of Plaintiffs are typical of the claims of all Class members. Plaintiffs and Class members were all subjected to Defendants' identical wrongful conduct based on the same transactions that occurred uniformly to the Class.

110.   **Adequacy**.  Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting class

actions of this type.  Plaintiffs and their counsel are committed to vigorously litigating this action, and have the resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

111.   **Superiority**.  Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy.  The class-wide treatment of common questions of law or fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiently of adjudication.

112.   Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs and Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

113.   The factual and legal bases of Defendants' liability to all Class members are the same.  All Class members have suffered harm as a result of Defendants' wrongdoing.

114.   **Commonality**.  There are many questions of law or fact common to the Class, and those questions predominate over any questions that may affect individual Class members.  Common questions include but are not limited to the following:

a.   Whether Defendants owed a duty to the Class, breached that duty, and engaged in actionable negligence;

b.   Whether express or implied contracts existed between Defendants and Class members concerning maintenance of Class members' electronic information and the provision of uninterrupted service for Sidekicks;

c.   Whether Defendants' conduct violated the California Consumer Legal Remedies Act;

d.   Whether Defendants' conduct violated Cal. Bus. & Prof. Code § 17200;

In re T-Mobile Sidekick Litigation              22                    **CONSOLIDATED CLASS ACTION COMPLAINT**

e.     Whether Defendants' conduct violated Cal. Bus. & Prof. Code § 17500;

f.     Whether Defendants' conduct violated the implied warranty of merchantability;

g.     Whether Defendants misrepresented to users that the Sidekick has a reliable automatic data backup and other data storage safeguards; and

h.     Whether Plaintiff and Class members have sustained damages, and if so, what is the proper measure of those damages.

115.   Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

116.   Injuries sustained by the Class flow from a common nucleus of operative facts.  In each case, Defendants represented that Sidekick users would always have access to their personal data, and that such data would be entrusted to Defendants to maintain and retain, and would be available regardless of what might happen to the individual phone.  Class members were harmed when access to their Sidekick data and service was unavailable.

117.   Class certification is appropriate under Fed. R. Civ. P. 23(a) and 23(b)(3).  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) with respect to the injunctive relief sought herein.

**COUNT I**
**VIOLATION OF THE CALIFORNIA**
**CONSUMER LEGAL REMEDIES ACT ("CLRA")**

118.   Plaintiffs re-allege all preceding allegations as if fully set forth herein.

119.   The Consumer Legal Remedies Act ("CLRA") applies to Defendants' actions and conduct because it extends to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

120.   Class members are "consumers" within the meaning of Cal. Civil Code § 1761(d). This Count applies to any person that used their Sidekick, in whole or in part, for personal use.

121.   The Sidekicks are "goods" within the meaning of Cal. Civil Code § 1761(a).  The services for which Sidekick owners pay a monthly fee are "services" within the meaning of Cal. Civil Code § 1761(b).

122.   Defendants violated the CLRA in at least the following respects:

a.    In violation of § 1770(a)(5), Defendants misrepresented that Sidekicks have characteristics, uses, benefits, or qualities that they do not have; and

b.    In violation of § 1770(a)(7), Defendants misrepresented that Sidekicks are of a particular standard or quality, which they are not.

123.   Defendants concealed material facts regarding Sidekicks from Plaintiffs and Class members, including that Sidekicks fail to perform in accordance with advertised performance specifications.  Among other things, Defendants misrepresented that Sidekicks have "always-on internet connections" and that Sidekicks have automatic data backup.

124.   A major selling point of Sidekicks was that users always had access to their data, and that such data would always be available, no matter what might happen to the Sidekick device.  Defendants failed to disclose that they did not invest the proper resources, including hardware, software, backup procedures, training, and testing, necessary to ensure that all functions operated to achieve the promises Defendants made.  Defendants saved money by not investing these necessary resources to fulfill these promises.

125.   Plaintiffs and Class members were harmed by Defendants' misrepresentations, as alleged herein.

126.   Defendants' failure to disclose the Sidekicks' inability to meet advertised performance standards, and Defendants' concealment of a fatal flaw in the operation of Sidekicks

by which copies of users' data were maintained on unsecure servers, are omissions and concealments of material fact that constitute unfair, deceptive, and misleading business practices in violation of Cal. Civil Code § 1770(a).

127.    Plaintiffs seek an award of actual damages, punitive damages, court costs, attorney's fees, and any other relief the Court deems proper, pursuant to Cal. Civil Code § 1780(a) and (d).

128.    As a result of Defendants' violations of § 1770(a), Class members have suffered irreparable harm.  Plaintiffs seek the injunctive relief requested herein under Cal. Civil Code § 1780(a)(2).

**COUNT II**
**VIOLATION OF CAL. BUS. PROF. CODE § 17200, UNFAIR COMPETITION**

129.    Plaintiffs re-allege all preceding allegations as if fully set forth herein.

130.    Cal. Bus. Prof. Code § 17200 proscribes unfair competition, defined to include "any unlawful, unfair or fraudulent business act or practice."

131.    A major selling point of Sidekicks was that users always had access to their personal data, and that such data would always be available, no matter what might happen to the users' Sidekick device.  Defendants did not disclose that they failed to invest the resources, including hardware, software, backup procedures, training, and testing necessary to ensure that all functions operated to achieve the promises Defendants made.  Defendants saved money by not investing these necessary resources to back up their promises.

132.    Defendants' acts constituted unfair, deceptive, or unlawful business practices under § 17200.

133.    Defendants engaged in unfair business practices by, among other things:

a.    Engaging in conduct whereby the utility of that conduct was outweighed by the gravity of the consequences to Class members;

b.      Engaging in conduct that was reckless, unconscionable, or substantially injurious to Class members;

c.      Engaging in conduct that undermined the stated policies of the Consumer Legal Remedies Act; and

d.      Failing to disclose that Defendants had no backup plan or procedure if a failure should occur with servers that maintained users' data.

134.    Defendants engaged in unlawful business practices by, among other things, engaging in conduct that violated the various statutes and common law claims alleged herein.

135.    Defendants engaged in deceptive business practices by promising in written advertising implicitly or explicitly that user data related to the Sidekick devices and services would be safe and secure and "always on" and properly backed up when the truth was that such data was not safe and secure and "always on" and backed up with robust backup systems.

136.    As a result of Defendants' conduct, Plaintiffs and Class members have suffered injury in fact, lost valuable property (*i.e.*, data), and suffered other damages as alleged herein.

137.    Plaintiffs seek individual restitution, injunctive relief, and other relief allowed under Cal. Bus. Prof. Code § 17200 et seq.

138.    Plaintiff also seeks an award of attorneys' fees and costs under Cal. Bus. & Prof. § 17082 and private attorney general theory.

139.    Plaintiffs also seek the injunctive relief requested herein under Cal. Bus. & Prof. §§ 17070 and 17203.

### COUNT III
### VIOLATION OF CAL. BUS. PROF. CODE § 17500,
### FALSE OR MISLEADING STATEMENTS

140.    Plaintiffs re-allege all preceding allegations as if fully set forth herein.

141.    Defendants engaged in advertising and marketing to the public, and offered

Sidekicks for sale on a nationwide basis including in California.  Defendants offered for sale Sidekicks that were represented to have, among other things, an "always-on internet connection" and an "automatic data back-up."  Defendants engaged in such advertising with the intent to induce buyers to purchase Sidekicks and enter into long-term service contracts.

142.    Defendants' advertising was untrue or misleading and was likely to deceive the public.  The advertising portrayed a level of performance and reliability that the Sidekick phones did not have.

143.    In making the misleading statements, Defendants knew, or by the exercise of reasonable care should have known, that the statements were misleading.

144.    Defendants' misleading advertising constituted unfair competition for purposes of Cal. Bus. & Prof. Code § 17200.

145.    As a result of Defendants' conduct, Plaintiffs and Class members have suffered injury in fact, lost valuable property (*i.e.*, data), and suffered other damages as alleged herein.

**COUNT IV**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY,**
**CAL. CIV. CODE § 1790 ET SEQ.**

146.    Plaintiffs re-allege all preceding allegations as if fully set forth herein.

147.    Defendants' Sidekicks were accompanied by an implied warranty of merchantability when sold, pursuant to Cal. Civil Code § 1792.

148.    Cal. Civil Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.
(2)    Are fit for the ordinary purposes for which such goods are used.
(3)    Are adequately contained, packaged, and labeled.
(4)    Conform to the promises or affirmations of fact made on the container or label.

149.    The Sidekicks would not pass without objection in the mobile telephone trade

because, among other things, they were not capable of adequately storing users' electronic information or providing uninterrupted service.

150.    The Sidekicks were not fit for the ordinary purposes for which such goods are used because, among other things, they were not capable of adequately storing users' electronic information or providing uninterrupted service.

151.    The Sidekicks were not adequately packaged or labeled because, among other things, there were no warnings that users' electronic information was subject to an unreasonable risk of loss, that service was subject to prolonged interruption, or that Defendants' backup procedures were deficient.

152.    Defendants breached the implied warranty of merchantability by providing Sidekicks that could not adequately store users' electronic information or provide uninterrupted service.

153.    As a result of Defendants' conduct, Plaintiffs and the Class have suffered damages as alleged herein.  Plaintiffs seek the damages and injunctive relief set forth herein pursuant to Cal. Civil Code § 1794.

154.    Plaintiffs also seek attorneys' fees and costs under Cal. Civil Code § 1794.

## COUNT V
## NEGLIGENCE

155.    Plaintiffs re-allege all preceding allegations as if fully set forth herein.

156.    Defendants assumed a duty to exercise reasonable care in, among other things: (i) maintaining Class members' personal data; and (ii) providing uninterrupted service.

157.    Defendants' duties arose from, among other things, the relationship between the parties, and Defendants' disclosures on their websites, in advertising materials, and on product packaging.  For example, Defendants disclosed on several occasions that users' data would be backed up on servers.  These disclosures, among others, created a duty to reasonably maintain

users' data and provide uninterrupted service.

158.     Defendants breached their duties by failing to adequately maintain Class members' data or provide uninterrupted service.  Among other things, Defendants failed to properly design and operate their servers to prevent the data loss and service interruption.

159.     Defendants failed to exercise reasonable care in maintaining users' data and providing Sidekick service.

160.     But for Defendants' breach, Class members' electronic information would not have been lost, and their Sidekick service would not have been interrupted.

161.     Plaintiffs and Class members suffered and will continue to suffer damages including, but not limited to, loss of their electronic information and an interruption in service.

## COUNT VI
## BREACH OF EXPRESS CONTRACT

162.     Plaintiffs re-allege all preceding allegations as if fully set forth herein.

163.     Defendants agreed to, among other things, properly maintain Plaintiffs' and Class members' data and provide uninterrupted Sidekick service.  In exchange, Class members agreed to purchase Sidekick phones and monthly service.

164.     Valid consideration existed, as Class members paid money in exchange for Defendants' agreement to, among other things, maintain Class members' data and provide uninterrupted service.

165.     The parties' agreement is contained in customer contracts and related documents.

166.     Defendants breached their contracts because Defendants did not properly maintain Class members' electronic information or provide uninterrupted service.

167.     Class members suffered and will continue to suffer damages including, but not limited to, loss of their electronic information and an interruption in service.

## COUNT VII

**BREACH OF IMPLIED CONTRACT**

168.　Plaintiffs re-allege all preceding allegations as if fully set forth herein.

169.　Defendants agreed to, among other things, properly maintain Plaintiffs' and Class members' data and provide uninterrupted Sidekick service.  In exchange, Class members agreed to purchase Sidekick phones and monthly service.

170.　Defendants entered into implied contracts with Class members.  Implied contracts arose from the course of conduct between the parties, as well as disclosures on Defendants' websites, in advertising materials, on product packaging, and/or in customer contracts.  For example, Defendants disclosed on numerous occasions as alleged herein that users' data would be backed up on Defendants' servers.  The disclosures created a reasonable expectation that users' data would be adequately maintained, and that the Sidekick's functionality would be continuously available.

171.　Valid consideration existed, as Plaintiffs and Class members paid money to Defendants in exchange for Defendants' agreement to, among other things, maintain users' data and provide uninterrupted Sidekick service.

172.　Defendants breached their implied contracts because they did not properly maintain Class members' electronic information or provide uninterrupted service.

173.　Plaintiffs and Class members suffered and will continue to suffer damages including, but not limited to, loss of their electronic information and an interruption in service.

**JURY TRIAL DEMANDED**

174.　Plaintiff hereby demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

175.　WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter an Order:

a.       Certifying the proposed Class under Fed. R. Civ. P. 23;

b.       Finding that Defendants are liable under all legal claims asserted herein for their failure to properly maintain Class members' electronic information and failure to provide uninterrupted Sidekick service;

c.       Ordering injunctive relief, including but not limited to: (i) restoration of unrestored data; and (ii) improvements in Defendants' Sidekick server to properly maintain, store, and/or back up users' electronic information and provide uninterrupted service;

d.       Awarding damages to the Class under the common law and statutory theories alleged herein, including compensatory damages, consequential damages, punitive damages, and any other damages allowed under the law;

e.       Declaring that Defendants have breached their express and/or implied contracts with Class members;

f.       Awarding attorneys' fees and costs; and

g.       Awarding any other legal or equitable relief as justice requires.

## JURY DEMAND

Plaintiffs request a jury trial as to all issues triable by jury.

Respectfully submitted,

Dated: February 19, 2010

By: s/ Ira Rothken
IRA P. ROTHKEN
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, CA 94949
Tel: (415) 924-4250
Fax: (415) 924-2905
ira@techfirm.com

SHERRIE R. SAVETT
DOUGLAS RISEN
JON LAMBIRAS
SHOSHANA SAVETT
BERGER & MONTAGUE, P.C.

1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4636
ssavett@bm.net
drisen@bm.net
jlambiras@bm.net
stsavett@bm.net

MICHAEL J. ASCHENBRENER
JAY EDELSON
EDELSON MCGUIRE, LLC
350 N. LaSalle Street, Suite 1300
Chicago, IL 60654
Tel: (312) 589-6379
Fax: (312) 589-6378
maschenbrener@edelson.com
jedelson@edelson.com

SAMUEL H. RUDMAN
MARK S. REICH
COUGHLIN STOIA GELLER RUDMAN
    & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173
srudman@csgrr.com
mreich@csgrr.com

*Co-Lead Counsel for Plaintiffs and the Class*